IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 3, 2025

## IN RE GABRIEL T.

**Appeal from the Juvenile Court for Humphreys County**
**No. J-163-23     Haylee Ann Bradley-Maples, Judge**

_____

### No. M2024-00486-COA-R3-PT

_____

This appeal concerns termination of parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Humphreys County ("the Juvenile Court") seeking to terminate the parental rights of Tabitha P. ("Mother") and Cody T. ("Father") to their minor child Gabriel T. ("the Child"). After a hearing, the Juvenile Court entered an order terminating Mother's and Father's parental rights on several grounds. Mother and Father appeal, arguing mainly that DCS failed to assist or communicate with them. The Juvenile Court determined that Mother and Father were not credible witnesses, a determination we leave undisturbed. We find that each ground for termination found by the Juvenile Court was proven by clear and convincing evidence. We find further by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's and Father's parental rights is in the Child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Diane E. Martin, Waverly, Tennessee, for the appellant, Cody T.

Jennifer L. Honeycutt, Franklin, Tennessee, for the appellant, Tabitha P.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born in July 2022. He suffered from neonatal abstinence syndrome and tested positive for amphetamines, methamphetamine, and THC. Mother and Father reported being homeless. In August 2022, DCS filed a dependency and neglect petition seeking temporary legal custody of the Child. The Child subsequently was removed into DCS custody. The Child was adjudicated dependent and neglected as well as a victim of severe child abuse at the hands of Mother and Father based on the Child's exposure to methamphetamine in utero. At a September 2022 hearing, Mother and Father tested positive for a variety of illegal drugs.

Mother's and Father's first permanency plan was created in August of 2022. This first plan required the parents to complete an alcohol and drug ("A & D") assessment and follow recommendations; undergo random drug screens; sign releases of information so that DCS could obtain the parents' records; find a job and provide proof of employment for 4-6 months consecutively; complete three months of parenting education and follow recommendations; and pay child support. In March 2023, a second permanency plan was created. This second plan was substantially similar to the first plan, although it added a requirement that Mother and Father contact DCS to set up services.

On May 5, 2023, DCS filed a petition in the Juvenile Court seeking to terminate Mother's and Father's parental rights to the Child. In February 2024, the Juvenile Court heard DCS's petition. First to testify at the hearing was Krista Vermilye ("Vermilye"), DCS family service worker on the Child's case. Vermilye first met the parents in court in September 2022. Mother and Father had been invited to a meeting regarding their permanency plan. They responded "got it" but did not show up. Then, Vermilye arranged for Mother and Father to visit the Child, but the parents failed to attend. Additional attempts to arrange visits were unsuccessful as well. Vermilye asked Mother and Father to confirm in advance that they would attend a visit or otherwise she would cancel it because she did not want to transport the Child a long way for nothing. Vermilye continued reaching out to the parents for visitation, but they never visited. Mother and Father told Vermilye that they were homeless because of a flood and were living in cars, with friends, or in hotel rooms.

At the September 2022 hearing, Mother and Father tested positive for MDMA, ecstasy, THC, amphetamine, methamphetamine, cocaine, and Suboxone. Vermilye stated that she offered to help the parents set up services. However, Vermilye had a hard time contacting them. She tried via Facebook, searched for addresses, and reached out to family members. Vermilye tried this at least twice a month. Mother and Father did not respond

-2-

to an invitation to a meeting concerning their second permanency plan in January 2023. Mother and Father never completed any of their required assessments, nor did they undergo any random drug screens. In January 2024, Mother and Father tested negative for drugs at a scheduled court appearance. With respect to housing, in July 2023, Mother and Father provided DCS with an address. Nevertheless, Vermilye still was unable to contact the parents. She had given them her contact information at the September 2022 hearing. Vermilye tried four or five times to visit the parents at their residence, but they never answered the door. Vermilye would leave contact information. She was never able to determine whether Mother and Father's residence was suitable. Vermilye testified that it would be detrimental to the Child if he were removed from his foster home, which he had lived in since he was discharged from the hospital.

On cross-examination, Vermilye affirmed that she had given Mother and Father a copy of their permanency plan at the September 2022 hearing. Asked if DCS made any efforts to help the parents find housing, Vermilye testified: "They did not want help. They were on the wait list to get the Dickson County Housing Authority housing, and they said that that's what they were going to keep waiting to do." Vermilye stated further that Mother and Father were uninterested in help getting a job. They instead wanted to do "side jobs under the table."

Next to testify was Ashley G. ("Foster Mother"), the Child's foster mother. The Child had been in Foster Mother's home since he was five days old. Foster Mother is married. She has a three-year-old biological child and a one-year-old foster child in the home. Foster Mother testified that the Child is bonded to his foster family. The Child is enrolled in developmental therapy, which he participates in once a month. Either Foster Mother or her husband takes the Child to his doctor's appointments. Foster Mother testified that the Child is healthy. She and her husband would be interested in adopting the Child if he becomes available for adoption. The Child has his own room in the foster family's home. According to Foster Mother, the Child has never seen Mother or Father.

Mother testified next. Mother denied having been offered visitation at the September 2022 hearing. Regarding her failed drug test, Mother said that she tested positive for MDMA because she was taking Excedrin. Mother generally denied Vermilye's testimony about the variety of drugs she tested positive for. Asked by the Juvenile Court why Vermilye would invent such claims against her, Mother had no explanation. Pressed further on visitation, Mother recalled being told about a meeting to schedule a visit, but she never heard "much back." Mother said that she believed she was forbidden by court order from visiting the Child. Asked if she ever tried to bring this up in court, Mother said that "it was never brought up about visitation." Mother stated further that she was never contacted about taking any classes. As for communication with Vermilye, Mother said in part: "[T]here was a period where she tried to call and text, and

-3-

we'd try to call and respond back, you know. And it'd just be hit or miss. It wouldn't go through for one reason or another." Regarding drug abuse, Mother stated that she was not currently using drugs. Mother said that she and Father tried "several times" asking Vermilye for visits with the Child, but nothing happened. Asked what she has done to stay sober, Mother said that she was "trying to look for employment and just trying to change things in my life all the way around." Mother said that she and Father live with Father's grandmother.

On cross-examination, Mother said that she had not used methamphetamine in "[w]ell over a year. Over two years." Mother blamed her testing positive for methamphetamine on having been exposed to the substance by someone she was staying with at the time. Mother had other children in addition to the Child, but she did not have custody of them either. Mother said that she had not provided any diapers or support for the Child, but that she "wasn't aware that we were allowed to bring diapers or anything." Asked why she was not working, Mother said that she broke her ribs three weeks earlier.

Father testified last. Father testified that he is a "jack of all trades," working in auto mechanics, remodeling, repair, and landscaping. By trial, Father had a job working 30 to 40 hours per week, although "[i]t varies all the time." He started his new job about three weeks before trial. Asked why he had not done anything on his permanency plan, Father stated that he was "[t]rying to get on my feet more than anything." Father said that he had never heard anything about visiting the Child. Asked by the Juvenile Court why Vermilye would have lied in her testimony about offering visitation, Father said: "I don't know what caused it. I just know what I know."

On cross-examination, Father said that he had not used methamphetamine in several years. Father said that he had previously tested positive for methamphetamine because he was exposed to it from a person he was living with at the time. Asked why he failed to visit the Child, Father said that he was "[t]rying to get stuff established." He also blamed "miscommunications." Father began paying child support shortly before trial. He paid $50 the week before and $100 the week of trial. Asked if he had ever been to rehab, Father said that he had not, although he used to attend a sobriety program at church. Father said that he could pass a hair follicle test if one were administered. As to his and Mother's residence, Father clarified that it is a shed behind his grandmother's house. Father said that the shed is small but "nice inside."

In March 2024, the Juvenile Court entered an order terminating Mother's and Father's parental rights to the Child. Mother and Father appealed this order. In August 2024, upon DCS motion, we remanded for entry of a new final order compliant with Tenn. Code Ann. § 36-1-113(k). In September 2024, the Juvenile Court entered an amended final order terminating Mother's and Father's parental rights. The Juvenile Court found that

-4-

DCS had proven against Mother and Father by clear and convincing evidence the grounds of abandonment by failure to visit, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, persistent conditions, severe child abuse, and failure to manifest an ability and willingness to assume custody. The Juvenile Court found further by clear and convincing evidence that termination of Mother's and Father's parental rights is in the Child's best interest. In addition, the Juvenile Court deemed Mother's and Father's testimony "to not be credible." In its order, the Juvenile Court found, in part:

### A. Abandonment — Failure to Visit

Pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and 36-1-102(1)(A)(i)(a)(2), there is clear and convincing evidence that [Mother] and [Father] abandoned the child by failing to visit. During the relevant time period of January 4, 2023, to May 4, 2023, [Mother] and [Father] had no visits with the child. They have not visited the child a single time since he came into custody. Father and Mother are the "king and queen" of playing victim and nothing is their fault. The Department facilitated visitation by scheduling visits and attempting to reach out to the parents. [Mother] testified a neighbor told her that Ms. Vermilye had been by her home. The only texts Father and Mother received were the ones that seem to be convenient for them.

### B. Abandonment — Failure to Provide a Suitable Home

Pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and 36-1-102(1)(A)(ii), there is clear and convincing evidence that [Mother] and [Father] abandoned the child by failing to provide a suitable home. The child was removed from the home of [Mother] and [Father] on August 1, 2022, and the Court found that it was reasonable to make no further effort to maintain the child in the home. The Humphreys County Juvenile Court adjudicated the child dependent and neglected on September 27, 2022.

Father and Mother testified to at least four separate addresses and living in a van during the custody episode. Ms. [Vermilye] went to several different addresses, she found doing searches, and Father and Mother were not residing at any of those addresses. Ms. [Vermilye] spoke with family members and was informed that they were homeless. The Department was unable to locate them for almost a year despite attempts to do so. In July 2023, Father and Mother went to the Department's office in Dickson, Tennessee, and left a new address. They were aware of the location of the Department. Ms. [Vermilye] went to the address reported by Mother and Father 4 to 5 times and left a card stuck in the door. She received no response.

-5-

They left that address prior to the termination hearing and reported at least 2 other locations they had lived in since July 2023.

Due to the multiple locations reported as addresses, and reports of homelessness, as well as not making the residence they reported available for the worker to visit, Mother and Father did not provide a suitable home for the child. A child needs a stable and constant home to thrive in. In this case, the parents never had a consistent residence for more than a few months, and they did not allow the worker to even look at any of their residences. The Department made reasonable efforts to assist Father and Mother in making their home suitable for said child by offering to help find housing for them; however, they refused the help, and they failed to make any reasonable efforts to provide a suitable home for the child at an early date, and at the time of trial had not established a suitable home for the child.

The child is less than four years old, and for a period of three consecutive months prior to the filing of this termination, has failed to provide any kind of home for the child.

## C. Substantial Noncompliance with the Permanency Plan

Based on the facts set forth above, the Court concludes and finds that grounds for Termination of Parental Rights do exist as to [Mother] and [Father], by clear and convincing evidence, pursuant to T.C.A. §36-1-113(g)(2), based upon substantial noncompliance by [Mother] and [Father], with the statement of responsibilities in the permanency plans pursuant to the provision of title 37, chapter 2, part 4. The responsibilities set forth in the permanency plans devised for the child were reasonably related to remedying the conditions which necessitated foster care.

[Mother] and [Father] admittingly did not complete a single task on the permanency plan. They were provided a copy of the initial permanency plan on September 6, 2022, but report they do not recall receiving it. However, they each took a drug screen that date with the Department and were positive for MDMA, ecstasy, THC, suboxone, cocaine, and methamphetamine on that date. Even though they deny receiving the plan on September 6, 2022, they both acknowledge receiving a copy of the initial plan at some point and to date have not completed a single task on the plan.

## D. Persistence of Conditions

Based on the facts set forth above, the Court concludes and finds that grounds for Termination of Parental Rights do exist as to [Mother] and [Father], by clear and convincing evidence, pursuant to T.C.A. §36-1-

113(g)(3), because the child has been removed from the home of the parents for 18 months and the conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parents, still persist; and, there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parents in the near future; and, the continuation of the parent and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home as is more fully described above.

When the Department is unable to locate parents and/or they are dodging service, there is no way to tell if their situation has changed. The parents have done nothing to address their drug problem that led to the child's removal. The Court does not consider the screen they submitted to in January 2024 as a random screen as it was completed during a scheduled court appearance. They did not respond to the Department's attempts to obtain random screens during the case. [Mother] and [Father] testified they are staying with [Father's] grandmother, but he acknowledged during cross examination they were staying in the shed behind the property. The housing instability for the parents persists.

### E. Severe Abuse

Pursuant to Tenn. Code Ann. § 36-1-113(g)(4), clear and convincing evidence has been established that [Mother] and [Father] severely abused the child by exposing him to methamphetamine in utero which led to him being positive at birth for the drug. The Humphreys County Juvenile Court found the child to be severely abused due to him being exposed to methamphetamine in utero. The Court attributed the severe abuse to [Mother] and [Father] and the final order was not appealed therefore the issue of severe abuse is res judicata.

### F. Failure to Manifest an Ability and Willingness to Care for [the Child].

Pursuant to Tenn. Code Ann. § 36-1-113(g)(14), clear and convincing evidence has established that [Mother] and [Father] have failed to manifest an ability and willingness to care for the child and placing the child in either of their custody would pose a substantial harm to the child.

[Mother] and [Father] have not seen this child a single time since he entered the custody of the Department, which is only days after his birth.

They have not done anything that demonstrates a willingness or ability to regain custody of this child. The child has been in the same foster home for eighteen months and it is the only home he has known. Returning the child to [Mother] and [Father] would pose a risk of substantial harm to the physical or psychological welfare of the child.

## CONCLUSIONS OF LAW — BEST INTEREST

Having concluded that a statutory ground exists for the termination of [Mother's] and [Father's] parental rights, the Court next examines whether termination is in the child's best interests. Under Tennessee law, the Court is required to find that termination of parental rights is in the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(i). The best interest determination is a fact-intensive analysis and involves consideration of the statutory factors listed in Tenn. Code Ann. § 36-1-113(i). This Court finds by clear and convincing evidence that it is in the child's best interest for [Mother's] and [Father's] parental rights to be terminated.

The child was placed in a foster home with [Foster Mother] and her husband when he was discharged from the hospital when he was only days old. The foster parents love the child and have a bond with him. He has a foster sibling who is one year older than him, and he has a close bond with. He refers to the child as "bubba". He is also bonded with the extended family of the foster family, especially the grandfather. The foster family takes him to doctor's appointment[s] and therapy for developmental delays. They love him and have expressed they will adopt him if he becomes available for adoption. It would be detrimental to remove him from their home, the only home he has known.

The child has not seen [Mother] or [Father] since he was approximately five days old. Ideally, children should be with their parents, but not when those parents are unfit and that is the situation in the present case. [Mother] and [Father] are not fit to care for the child. Neither parent has demonstrated a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of them. There's been no significant change in the circumstances of the parents. Neither parent has demonstrated a sense of urgency to address the issues necessitating foster care.

Based on the foregoing, the Court concludes by clear and convincing evidence pursuant to Tenn. Code Ann. § 36-1-113(i) that termination of [Mother's] and [Father's] parental rights is in the child's best interest.

Mother and Father timely appealed to this Court.

## Discussion

Although not stated exactly as such, both Mother and Father raise the issue of whether the Juvenile Court erred in finding grounds for termination of their parental rights to the Child. Father raises an additional issue of whether the Juvenile Court erred in finding that termination of his parental rights is in the Child's best interest. For her part, Mother declines to argue best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

---

[3] Tenn. Code Ann. § 36-1-113(i).

## B. Standards of Appellate Review

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Although Mother does not challenge the Juvenile Court's finding that termination of her parental rights is in the Child's best interest, we must review the issue anyway. *In re Carrington H.*, 483 S.W.3d at 511 ("[A]ppellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal.").

Several grounds for termination are at issue. On May 5, 2023, when DCS filed its petition, the relevant statutory grounds read as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

(4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child; [and]

***

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g) (West May 5, 2023 to May 10, 2023).

Two distinct grounds of abandonment are at issue—failure to visit and failure to provide a suitable home. On May 5, 2023, when DCS filed its petition, the relevant definitions of abandonment read as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended or supplemental pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

(ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i-ii) (West May 5, 2023 to June 30, 2023).

Beginning with Mother's issues, we first address whether the Juvenile Court erred in finding the ground of abandonment by failure to visit against Mother. The relevant four-month period for our review is January 5, 2023, through May 4, 2023. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014), *no appl. perm. appeal filed* ("[T]he applicable four month window for determining

-14-

whether child support has been paid in the context of . . . failure to support includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed.").[4] Mother never visited the Child. As a defense, Mother contends that her failure to visit was not willful in nature. Mother testified to various excuses for why she did not visit. However, the Juvenile Court deemed Mother's testimony not to be credible. We extend great deference to trial courts' credibility determinations, and we overturn them only upon a showing of clear and convincing evidence. *See Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). We find no clear and convincing evidence that would overturn the Juvenile Court's credibility determination. Mother has failed to prove by a preponderance of the evidence that her failure to visit was not willful. On the contrary, as found by the Juvenile Court, Mother's excuses were unavailing. We find, as did the Juvenile Court, that the ground of abandonment by failure to visit was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of abandonment by failure to provide a suitable home against Mother. On this ground, Mother points to hardships that she dealt with in the aftermath of a flood. She also notes Vermilye's testimony that she did not help the parents find a suitable home because they "did not want help." As relevant to this ground, the Child was removed from Mother's custody in August 2022 during a dependency and neglect proceeding. Thereafter, Mother failed to engage in her permanency plan or work services despite DCS's efforts. This is key because, in addition to failing to obtain a suitable residence in physical terms, Mother failed to show that she had a suitable home in terms of it being safe and drug-free. This situation ensued for four months following the Child's removal and beyond. Mother simply did next to nothing in this case. By trial, Mother lived in a shed behind Father's grandmother's house, the suitability of which is unknown. DCS's efforts to help Mother obtain suitable housing exceeded Mother's efforts, which effectively were nil. We find, as did the Juvenile Court, that the ground of abandonment by failure to provide a suitable home was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan against Mother. As found by the Juvenile Court, Mother did not complete a single task on her plan. Mother asserts that she did not understand what was expected of her and what the consequences of inaction were. However, Mother's excuse is unavailing. Vermilye gave Mother a copy of the initial permanency plan. She explained to Mother what it entailed. If Mother did not understand a particular aspect of the plan, she never followed up with DCS for clarification. By doing essentially nothing on her permanency plan, Mother's degree of noncompliance was

---

[4] The Juvenile Court wrongly stated the four-month period as being January 4, 2023, through May 4, 2023. DCS repeats the error in its brief. However, given that Mother never visited the Child at all during the custodial episode, the error makes no difference to the analysis.

substantial. This case originated in substance abuse and homelessness. Mother's failure to do anything on her permanency plan, including those measures designed to address substance abuse and homelessness, were highly detrimental to her prospects of reunification with the Child. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan was proven against Mother by clear and convincing evidence.

Continuing our review of grounds, we address whether the Juvenile Court erred in finding the ground of persistent conditions against Mother. The Child was removed from Mother's custody in August 2022 during a dependency and neglect proceeding, and this period lasted for at least six months. The initial conditions that led to removal were substance abuse and homelessness. Mother points to her clean drug test in January 2024 and her living in a shed on Father's grandmother's property as evidence that she has rectified the conditions necessitating removal. However, these facts are not dispositive. First, Mother's January 2024 clean drug test was not random. This meant that Mother could prepare for the test without truly addressing her substance abuse issues. As recently as September 2022, Mother tested positive for a range of drugs. Regarding housing, it is unknown whether the shed that Mother lives in is suitable for the Child. Mother has not cooperated with DCS on inspections. Thus, the conditions necessitating the Child's removal had not been remedied by trial. Given that the case went on for some 18 months to that point, there is little likelihood that these conditions will be rectified. Under these circumstances, continuing the parent-child relationship between Mother and the Child diminishes the Child's chances of early integration into a safe, stable, and permanent home. We find, as did the Juvenile Court, that the ground of persistent conditions was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of severe child abuse against Mother. A prior finding of severe child abuse by a juvenile court in dependency and neglect proceedings can be *res judicata* in later parental rights termination proceedings. *See In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). In those cases, the doctrine of *res judicata* prevents a parent from re-litigating whether he or she committed severe child abuse. *Id*. Here, the Juvenile Court found during the dependency and neglect proceedings that Mother perpetrated severe child abuse upon the Child by exposing him to methamphetamine in utero. There is no hint that this order was appealed. Nevertheless, Mother argues that the severe child abuse finding in the dependency and neglect order cannot sustain this ground for termination because the finding of severe child abuse was not made by the standard of clear and convincing evidence. However, findings of severe child abuse in dependency and neglect orders are not subject to collateral attack in termination appeals. *See In re Charlee N.*, No. M2022-01686-COA-R3-PT, 2023 WL 4883615, n.5 (Tenn. Ct. App. Aug. 1, 2023), *perm. app. denied Oct. 17, 2023* ("[W]e also note existing case law that clearly holds that a finding of severe child abuse in a dependency

and neglect order is *not* subject to a collateral attack in a termination of parental rights appeal.").[5]  The issue of Mother's perpetration of severe child abuse upon the Child is *res judicata*.  We find, as did the Juvenile Court, that the ground of severe child abuse was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody against Mother.  Tenn. Code Ann. § 36-1-113(g)(14) provides that: "A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" (West May 5, 2023 to May 10, 2023).  Thus, there are two prongs to this ground.  Regarding the first prong, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020).  Regarding the second prong, and as relevant to this appeal, "[t]his Court has previously held that when a parent is essentially a stranger to a Child, and the Child is thriving and bonded in his or her current household, forcing the Child to begin visitation with the estranged parent is likely to cause psychological harm to the Child." *In re Isabella G.*, No. M2022-00246-COA-R3-PT, 2023 WL 1131230, at *12 (Tenn. Ct. App. Jan. 31, 2023), *no appl. perm. appeal filed*.

Mother argues that, by trial, she had rectified the issues that led to removal.  However, Mother rejected services and drug screens, so we have no way of knowing whether she has successfully addressed her problems.  Likewise, we have no way of knowing whether her residence is suitable for the Child.  Mother has largely avoided DCS.  This non-cooperation on Mother's part shows a lack of willingness on her part to do the things necessary to assume custody of the Child.  In addition, Mother has not manifested an ability to parent the Child.  Mother is unemployed, has housing of unknown suitability for a child, and has never addressed her substance abuse problem.  We find, as did the Juvenile Court, that Mother has demonstrated neither the ability nor the willingness to assume custody of the Child.

Regarding the second prong to this ground, the Child knows only the home of his foster family.  He has lived there since he was discharged from the hospital.  He is bonded with the foster family, and his foster parents provide for his needs.  By contrast, Mother is a stranger to the Child.  Placing the Child in Mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Child.  Both

---

[5] In addition, the order in question invokes the clear and convincing standard for the dependency and neglect finding.  We are satisfied that the same standard also was applied to the severe child abuse finding.

prongs of this ground were proven against Mother by the requisite clear and convincing evidence. We find, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume custody was proven against Mother by clear and convincing evidence.

Having affirmed grounds for termination, we address whether the termination of Mother's parental rights is in the Child's best interest. On May 5, 2023, when DCS filed its petition, the statutory best interest factors read as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
(F) Whether the child is fearful of living in the parent's home;
(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;
(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render

-18-

the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West May 5, 2023 to May 10, 2023).

Mother declined to raise an issue as to best interest. Given our Supreme Court's holding in *In re Carrington H.*, we still must review it. The Juvenile Court made a number of findings relative to best interest and concluded that termination of Mother's parental rights is in the Child's best interest. While the Juvenile Court did not explicitly cite the best interest factors, it is evident that it considered them in its analysis. The evidence does not preponderate against the Juvenile Court's findings. Amongst the most salient points regarding best interest, the Child is bonded to his foster family, and they meet his needs. The Child has never known another home. By contrast, Mother is a stranger to the Child. Indeed, Mother and the Child have no relationship, as she has never visited the Child. Mother has never made a lasting adjustment in her circumstances. In fact, she did next to nothing on this case. Given her unemployment, her housing instability, and her unaddressed substance abuse issues, Mother simply is in no position to care for the Child any time soon. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Child's best interest.

Turning now to Father's issues, we address whether the Juvenile Court erred in finding the ground of abandonment by failure to visit against Father. The relevant timeframe for our review is January 5, 2023, to May 4, 2023.[6] Father failed to visit the Child at all during the custodial episode. Father points to his testimony whereby he said that he did not know about visitation and that DCS failed to communicate with him. The Juvenile Court did not credit Father's excuses, and there is no clear and convincing evidence that would overturn the Juvenile Court's credibility determination regarding Father. Thus, Father never visited the Child, and he offers no valid justification or defense. We therefore find, as did the Juvenile Court, that the ground of abandonment by failure to visit was proven against Father by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of abandonment by failure to provide a suitable home against Father. Father points to his testimony in which he said that DCS failed to help him find housing. However, the Juvenile Court did not credit Father's excuse. The Child was removed from Father's custody in August 2022 as part of a dependency and neglect proceeding. Father failed to follow up with services. In this, he had no justification or reasonable excuse. This state of affairs continued for four months following the Child's removal and beyond. By trial, Father lived in a shed behind his grandmother's house, the suitability of which is unknown due to Father's non-cooperation with DCS. Father never established a home that proved to be suitable for the Child despite DCS's reasonable efforts. We find, as did the Juvenile Court, that the ground of abandonment by failure to provide a suitable home was proven against Father by clear and convincing evidence.

---

[6] The effective dates for the termination statutes are the same for Father and as they were for Mother.

We next address whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan against Father. On this ground, Father states that he has obtained housing; that he has a job; and that he started to pay child support. However, Father exhibited housing instability early in the case, having declined DCS help. He ended up living in a shed behind his grandmother's house. It is unknown whether the shed is suitable for the Child because Father failed to cooperate with DCS. With respect to his job and child support, Father began his new job three weeks before trial and started paying child support only a week before trial. These late steps by Father were commendable but came too late to show sustained improvement. *See In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *7 (Tenn. Ct. App. Aug. 15, 2023), *no appl. perm. appeal filed* ("[W]hile we commend Mother on her more recent sustained efforts toward sobriety and stability, Mother's efforts to complete the plan's requirements were simply too little, too late, to avoid this ground for termination."). In addition, Father never fulfilled his responsibilities toward addressing substance abuse, including an A & D assessment and random drug screens. These were key responsibilities given the circumstances of the Child's removal into state custody. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan was proven by clear and convincing evidence against Father.

We next address whether the Juvenile Court erred in finding the ground of persistent conditions against Father. As relevant to this ground, the Child was removed from Father's custody in August 2022 during a dependency and neglect proceeding for a period of at least six months. The initial conditions that led to removal were drug abuse and homelessness. Father testified at the hearing that he last used methamphetamine several years ago. He stated further that he was not actually using drugs when the Child was born, and that he was exposed to drugs while staying with a friend. However, we have only Father's word to go on since he failed to take random drug screens or undergo an A & D assessment, and the Juvenile Court found Father's testimony not to be credible. Meanwhile, it is unknown whether he has suitable housing because he did not cooperate with DCS. Thus, the major conditions necessitating the Child's removal were not remedied by trial. Given that the case lasted for some 18 months to that point, there is little likelihood that these conditions will be rectified. Under these circumstances, continuing the parent-child relationship between Father and the Child diminishes the Child's chances of early integration into a safe, stable, and permanent home. We find, as did the Juvenile Court, that the ground of persistent conditions was proven against Father by clear and convincing evidence.

Our review of grounds continues as we address whether the Juvenile Court erred in finding the ground of severe child abuse against Father. Father asserts that he did not use drugs at the time of the Child's birth, and that he tested positive only because he was exposed to methamphetamine while staying with a friend. Once again, the Juvenile Court did not credit Father's testimony. In any event, this ground is *res judicata* based upon the

unappealed, prior order finding that Father perpetrated severe child abuse against the Child. We find, as did the Juvenile Court, that the ground of severe child abuse was proven against Father by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody against Father. As to the first prong of this ground, Father argues that he has demonstrated his willingness to assume custody by participating in the termination proceedings. Father argues further that he has shown the ability to parent the Child by having a home, finding a job, and paying child support. First, Father's mere participation in the termination proceedings is insufficient on its own to show his willingness to assume custody of the Child. Father neglected to stay in touch with DCS, failed to work on his permanency plan, and took some positive steps only at the last minute. Father's mere participation in the termination proceedings is not a sign of genuine willingness to assume custody of the Child and all that that entails. Second, Father's positive steps like getting a job and paying child support were good but came too late. Likewise, it is unknown whether Father's residence is suitable for the Child since he failed to cooperate with DCS. Meanwhile, Father began his new job only three weeks before trial and started paying child support only a week before trial. Even crediting these tardy developments, Father never adequately cooperated on substance abuse treatment. He failed to take random drug screens or undergo an A & D assessment, major omissions in a case originating in the Child's exposure to methamphetamine in utero. Therefore, we find that Father manifested neither the ability nor the willingness to assume custody of the Child.

Regarding the second prong of this ground, the Child has known only the home of his foster family. On the other hand, Father is a stranger to him. Father never even visited the Child during the custodial period. Placing the Child in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Child. Both prongs of this ground were proven against Father by the requisite clear and convincing evidence. We find, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume custody was proven against Father by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Child's best interest. Father argues that, when the factors are weighed in their totality, termination of his parental rights is not in the Child's best interest.[7] To this end, Father makes several points, to wit: that Father has a home; that Father has a job; that Father began paying child support; that DCS failed to

---

[7] In his brief, Father incorrectly cites the older version of Tenn. Code Ann. § 36-1-113(i) which contains only nine best interest factors. That version is inapplicable here.

make reasonable efforts to help Father; that communication problems were the reason why Father did not visit the Child; that Father's care of the Child would somehow inherently be better than that of the foster family; that Father loves the Child; and that Father has the means to provide for the Child.

We begin by acknowledging that, by trial, Father had taken certain positive steps. He was employed and had begun to pay child support. However, he got his job three weeks before trial and began paying child support only a week before trial. These steps were commendable but too late to show bona fide change. Additionally, while Father touts his residence, he failed to cooperate with DCS to ensure that the residence is suitable. Indeed, even if the shed proved physically suitable, Father failed to take the necessary steps to ensure that it would be suitable for the Child in other respects. Father failed to cooperate on substance abuse issues. He never took random drug screens. He never submitted to an A & D assessment, let alone follow recommendations. Thus, even if Father has a physically appropriate house, the danger to the Child from drug exposure remains. This is an especially relevant concern given that the Child entered state custody because of exposure to methamphetamine in utero. Substance abuse is a foundational issue in this matter, and Father's failure to address that issue in a meaningful way is significant. By contrast, the unrebutted evidence is that the Child is thriving in his foster home. The Child's foster family is the only one he knows. Given these circumstances, it would be contrary to the Child's best interest to prolong his limbo any further. The evidence does not preponderate against the Juvenile Court's findings relative to best interest. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Father's parental rights is in the Child's best interest. We affirm the Juvenile Court's judgment in its entirety.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellants, Cody T. and Tabitha P., and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE